# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| IN RE | ) | |
| | ) | |
| **GLADYS MARIE JAYO** | ) | **Case No. 06-20051-TLM** |
| | ) | |
| Debtor. | ) | **MEMORANDUM OF DECISION** |
| | ) | |
| _____ | ) | |

## INTRODUCTION

This chapter 11 case comes before the Court on the motion of the Office of

the United States Trustee ("UST"), *see* Doc. No. 45 ("Motion"), joined in by

creditors Maynard, LLC ("Maynard") and the United States Farm Services

Administration ("FSA")[1], seeking to convert the case back to a chapter 7

liquidation, which is where it originated with the voluntary petition of debtor

Gladys Marie Jayo ("Debtor") on March 28, 2006.[2]

The Motion was heard on June 28, 2006, and taken under advisement.  The

Court concludes that the UST and the joining creditors have established cause for

---

[1]  Creditors World Wide Asset Management, Dickerson Pump & Irrigation, Benjamin
Jayo, and Bell Equipment also joined in the UST's Motion.  *See* Doc. Nos. 64-67.  Unlike FSA
and Maynard, these creditors did not participate in the June 28 hearing on the Motion.

[2]  The petition was filed after the October 17, 2005 effective date of the Bankruptcy
Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA"), Pub. L. 109-8, 119 Stat. 23
(April 20, 2005).  BAPCPA's provisions thus apply, and citations in this Decision to sections of
Title 11, U.S. Code are to the BAPCPA-amended Bankruptcy Code.

MEMORANDUM OF DECISION - 1

conversion under § 1112(b), and that the defenses raised by Debtor are unavailing.

The Motion will therefore be granted and by separate order the case is today

converted to chapter 7.  This Decision constitutes the Court's findings of fact and

conclusions of law on the contested matter.  Fed. R. Bankr. P. 9014, 7052.

## BACKGROUND AND FACTS

As noted, Debtor filed a voluntary chapter 7 petition on March 28, 2006,

the day before a scheduled foreclosure sale by Maynard.  After switching counsel,

she converted the case to a chapter 11 on May 11, 2006.  As Debtor in Possession,

she filed a proposed chapter 11 plan and disclosure statement.  *See* Doc. Nos. 72

("Plan"), 80 ("Disclosure Statement"), both filed June 27, 2006.  She thereunder

proposes to liquidate her primary asset, over 600 acres of real estate near Priest

Lake, Idaho, and pay all creditors from the proceeds of that sale.  Her Plan

provides that, if the sale is not consummated within 6 months of confirmation, she

will voluntarily re-convert to chapter 7.

The UST and moving creditors sought conversion of the case to chapter 7

soon after the conversion to chapter 11 and well prior to the filing of the Plan.

The proposed Plan does not assuage their concerns and does not change their

position on immediate conversion to a chapter 7 liquidation.

Their arguments that "cause" exists under § 1112(b) have several bases.

They contend that, by reason of admitted criminal conduct, Debtor is "ineligible"

MEMORANDUM OF DECISION - 2

to be a debtor in possession.  They also assert that she falsely testified at her

§ 341(a) examination.  They allege that she falsely responded to questions on her

statement of financial affairs and made numerous false statements in her

schedules.

Debtor argues that she suffers no statutory or other ineligibility to serve as a

debtor in possession.  She also contends that there is inadequate "cause" proven

under § 1112(b).  Alternatively, if such cause is found, she contends that

conversion is not an available remedy and dismissal is the only option because she

is a "farmer" protected from involuntary conversion by § 1112(c).

The record establishes the following.[3]

## A.

Debtor is 70 years old and widowed since 1996.  She lives on

approximately 660 acres of real property located near Priest Lake in Bonner

County, Idaho, to which she ascribes a value of $4,500,000.00.  Her estimate of

value is significantly higher than the $2,670,000.00 listing price she set in an

unsuccessful attempt to sell the property during 2005.

The property was acquired over a period of years, starting in 1955, and

_____

[3]  The Court's factual findings are based on the evidence and testimony presented at the
June 28 hearing, and also on the files and records of the Court which are judicially noticed under
Fed. R. Evid. 201.  *See also* Fed. R. Evid. 801(d) (allowing evidentiary effect to schedules and
other sworn statements of Debtor).  A few facts are taken from the Disclosure Statement; while
the Court appreciates that the same are Debtor's representations only, they are essentially
background in nature and not presently in controversy.

MEMORANDUM OF DECISION - 3

used as a cattle ranch by Debtor and her late husband, Paul Jayo.  They also raised

cattle on what is known as the Whitebird Ranch in central Idaho, a property they

conveyed in the 1980's to the Jayos' sons' partnership.

The Priest Lake property, historically used by Debtor as summer pasture for

cattle, currently has "timothy grass" growing on it which is usable as forage for

cattle.  It has not been grown, though, as a crop for harvesting and sale to others.

Were it to be sold, Debtor estimates its value at $30,000.00.  It was not listed on

either her original or amended schedule B.

There are also a number of old growth trees on the property.  Some of the

trees have been downed by wind and/or insects, and are being salvaged.  Debtor

has never managed the trees on the property as a crop nor grown trees for sale as

timber or lumber.  Though not mentioned on the first schedule B, "felled logs"

worth $1,000.00 are shown on amended schedule B as "crops."

## B.

Debtor, at certain times in the past, raised cattle under her personal name,

and under the trade name "Jayo Ranches" and under a limited liability company,

Northeast Cattle, LLC.[4]  At the time of filing, Debtor listed ownership of 60 head

of cattle.  These animals are secured to the benefit of FSA.  In fact, Debtor filed a

---

[4] Ex. 6 is a certificate of assumed business name for Jayo Ranches, signed by Debtor in
1999.  Ex. A to the June 27 amended schedule B (Ex.9 and Doc. No. 75) is a Debtor-signed
statement regarding dissolution of Northeast Cattle, LLC, filed with the Idaho Secretary of State
in August, 2003.

MEMORANDUM OF DECISION - 4

motion seeking an order of abandonment of these animals given the secured

indebtedness to FSA.  Doc. No. 68.  Following the hearing on June 28, the

abandonment request was withdrawn and Debtor indicated that it would be

replaced by a motion for approval of a sale under § 363.  *See* Doc. No. 90.

## C.

The Court has already noted some factual matters related to what Debtor

stated in her sworn and filed schedules and amended schedules.[5]  The UST and

creditors raise additional issues in this regard.

Debtor testified at the § 341(a) examination that her petition, schedules and

statement of financial affairs (SOFA) were true and accurate to the best of her

knowledge, with the exception of some changes – specifically described at that

examination – she and attorney would be making.  *See* Ex. 8 (transcript) at 10 to

17.[6]  The original schedules were verified as true and correct, as were Debtor's

responses to the SOFA.  There was a similar signature verification of the amended

---

[5] The original schedules were filed on March 28, 2006.  *See* Ex. 7 (also Doc. No. 1).  The
§ 341(a) examination in the chapter 7 was scheduled for May 4, and moved to May 12.  The
conversion to chapter 11 occurred on May 11.  The chapter 11 § 341(a) meeting took place on
June 16.  *See* Doc. No. 57.  The amended schedules and amended statement of financial affairs
were filed on June 27, the day prior to the hearing on the UST's Motion to convert.  *See* Doc.
Nos. 75-77.

[6] The anticipated amendments described in these relatively early stages of Debtor's
testimony (or, more accurately, described by her counsel and to which she agreed) did not include
some of the amendments actually made on June 27, those additional amendments evidently being
spurred by the extended and pointed questioning on June 16.  This Decision focuses on a few of
those "additional" amendments, and also on errors, omissions and other deficiencies never
corrected.

MEMORANDUM OF DECISION - 5

schedules, and the amended SOFA. *See* Ex. 9 (and Doc. No. 75) at 3, Ex. 10 (and

Doc. No. 77) at 6. Debtor testified at the June 28 hearing that the amended

schedules and SOFA filed the preceding day were accurate and that she took care

to make them so.

The 60 head of cattle were the only animals disclosed on the initial

schedule B. Debtor's amended schedule B adds three horses in her possession

worth $1,500.00 not previously disclosed, and indicates there may be others at the

Whitebird Ranch.

Debtor listed one vehicle worth $1,000.00 on her initial schedule B. In her

amendments, she added three other vehicles worth $15,500.00, though she

contends they, too, are located on the Whitebird property controlled by Maynard

and thus not readily available to her. She makes a similar allegation about a trailer

worth $2,000.00 which was omitted from her initial schedule B and added by

amendment.

In her first schedule I, Debtor indicated her sole income was in the form of

Social Security benefits of $590.00 per month. In amended schedule I, she shows

the same Social Security income but also $150.00 per month from sale of scrap

iron and $1,250.00 per month from sale of downed trees.[7] Testimony indicated

---

[7] Amended schedule B shows a total of $2,000.00 of scrap iron, and a total of $1,000.00
of felled logs. Thus there might be about 13 months of income available from the scrap iron,
given schedule I representations. However, there is an inconsistency between the amount of

(continued...)

MEMORANDUM OF DECISION - 6

that the scrap iron was in the form of old farm equipment which rests on the Priest River property.  Salvage of the downed timber was mentioned earlier, and a contract by which it was and is being salvaged is addressed below.

In answering question no. 1 on her SOFA, which asks for disclosure of gross business income in the partial year up to the filing date and in the prior two calendar years, Debtor declared "none since 1997."  In her amended SOFA, however, she disclosed gross business income during these periods totaling $43,310.00.

In response to SOFA question no. 2, inquiring about nonbusiness income within such time periods, Debtor initially disclosed $8,850.00.  She amended this answer later to $14,850.00.  Both disclosures related to Social Security benefits received.

## D.

The initial answer to SOFA question no. 4 regarding pending or recently concluded litigation disclosed "none."  Debtor's amendment, however, disclosed a pending criminal case, No. CR-05-003-N-EJL, before the United States District

---

[7](...continued)
felled logs on schedule B and the recurrent monthly income shown on schedule I.  (Debtor lists no other logs or timber on schedule B.)  The problem of inconsistent representations is exacerbated by the prepetition contract Debtor made regarding sale of the timber, as discussed below.

Court for the District of Idaho.[8]  Debtor and her son Paul V. Jayo were indicted on

ten counts of violation of 18 U.S.C. § 658[9] for "with the intent to defraud,

knowingly dispos[ing] of and convert[ing] to their own use property mortgaged or

pledged to [FSA]."  Ex. 1.  The alleged loss to FSA was more than $120,000.00.

*Id.*

Debtor admits that, in this criminal case, she pleaded guilty to a single

misdemeanor count of converting the cattle collateral of FSA.  *See* Disclosure

Statement at 7.  *See also* Ex. 2 (Plea Agreement).[10]  At the hearing on June 28, all

parties agreed that Debtor was scheduled to be sentenced by the District Court on

July 31, 2006.  The sentencing date is now August 1, 2006.[11]

---

[8]  The files and records in *United States v. Gladys Marie Jayo*, Case No. CR-05-003-N-EJL, are readily available to the Court as the Bankruptcy Court and District Court in the District of Idaho are consolidated.  The Court takes judicial notice of the files and records in that matter, for the purpose of establishing chronology and the present status of the criminal matter, a subject acknowledged and discussed by both Debtor and her adversaries.

[9]  The indictment and other pleadings in the criminal case also refer to 18 U.S.C. § 2 which provides that those who commit offenses against the United States, or those who aid, abet, etc. such commission, are punishable as principals.  For simplicity, the Court refers solely to § 658 in this Decision.

[10]  A condition of the Plea Agreement was Debtor's agreement to satisfy a judgment in favor of FSA entered in a civil foreclosure action, Case No. CV-02-0110-N-EJL.  The records of that action are also available to the Court and the litigants.  The judgment was entered in favor of the United States and against Debtor on July 14, 2005 in the amount of $1,020,123.67 (with interest at $142.75 per diem from February 10, 2005) and decreed foreclosure of the Bonner County property.

[11]  The records in the criminal case show certain events subsequent to this Court's June 28 hearing on the Motion.  First, the sentencing date was moved by the District Court from July 31 to August 1, 2006.  *See* Case No. CR-05-003-N-EJL at Doc. No. 65.  Next, Debtor through her criminal defense counsel filed a motion on July 7 to continue the sentencing hearing for three

(continued...)

MEMORANDUM OF DECISION - 8

**E.**

Debtor's § 341(a) examination occurred on June 16, 2006.  A transcript of the examination was introduced as Ex. 8.

At that examination, Debtor testified that she had not turned over any books or records to either of her bankruptcy attorneys.  Ex. 8 at 158.[12]  In fact, her answers, fairly interpreted, indicated she had very limited books and records in her possession, though there could be other records in Boise in the possession of some former attorneys.  Ex. 8 at 64-66, 156-158.  Yet immediately after the § 341(a) examination, she delivered sufficient books and records to an accountant to

_____

[11](...continued)
months.  *Id.* at Doc. No. 62.  In that pleading, Debtor's counsel states: "[T]he plea [of guilty] was conditioned upon Mrs. Jayo making restitution to the FSA in the amount of $1,079,766.45.  Mrs. Jayo will be able to meet this condition of her plea agreement, however, is unable to do so at this time because she has not yet sold her property.  It is anticipated that this can be accomplished within the next 90 days.  Mrs. Jayo cannot be sentenced if her plea of guilty cannot be accepted." The United States resisted the request.  *Id.* at Doc. No. 66.  The United States stated in response, in part:  "In order to avoid successive delays of the sentencing hearing, the Government will waive the condition in the plea agreement that requires satisfaction of the judgment due FSA prior to sentencing.  Instead, the Government will respectfully request that the [District] Court impose a restitution obligation to FSA as a condition of supervised release."  On July 20, the District Court issued an Order denying Debtor's requested continuance.  *Id.* at Doc. No. 68.  The District Court noted that "the Government's willingness to waive the provision of the plea agreement requiring repayment prior to sentencing in favor of making the requirement a term of supervised release is an appropriate and reasonable means for enabling this matter to proceed in a timely fashion towards ultimate resolution."

[12]  Though Debtor testified at the June 16 examination and initially during the June 28 hearing that she had given no books or records to her first bankruptcy attorney, later in the June 28 hearing, after admitting she had some records (like cattle sale invoices and similar data), she testified that "yes, I gave him [the first attorney] some."

MEMORANDUM OF DECISION - 9

prepare and file her tax returns for the years 2001 through 2005.[13]

**F.**

When asked at the § 341(a) examination if she had leased or rented any of the pasture on her property, Debtor indicated "no" and said the last pasture she had rented out was in 2002.  Ex. 8 at 25-26.  She later admitted at the June 28 hearing that she received approximately $3,000.00 in 2005 for renting pasture.  Her 2005 tax return, Ex. 1A, prepared from the documents she delivered immediately after the § 341(a) examination, reflects this 2005 pasture rental income.

**G.**

Debtor said nothing about other income or business activity at the § 341(a) examination.  She did tell Maynard's attorney about some minor or incidental logging of blown down or bug-infested trees on the Priest Lake property.  Ex. 8 at 28-32.  She admitted receiving some funds, though her testimony about the amounts is not clear.  It appears she admitted receiving one or perhaps two checks of $400.00, and possibly a check for $1,300.00.  She said there was no other 2005 logging.

Debtor admitted at the June 28 hearing, however, that she had entered into a contract with Riley Creek Lumber Co. to sell salvaged timber off her Priest Lake

---

[13]  It appears these delivered records were those Debtor had in her personal possession, and were not gathered from the Boise lawyers or any other third party.

MEMORANDUM OF DECISION - 10

property.[14]  *See* Ex. A ("Timber Deed and Security Agreement" entered into

November 8, 2005; check for $15,000.00 made payable to Debtor from Riley

Creek dated November 10, 2005; log purchase agreement dated October 28,

2005).[15]  The Riley Creek contract of November 8, 2005, was made less than five

months before Debtor filed this bankruptcy case.  It generated a $15,000.00

advance payment to her.  She signed these documents.  But the contract was not

disclosed on schedule G, nor was the transaction or income disclosed on the

original SOFA.[16]  The transaction and income were also not disclosed on the

amended SOFA filed on the eve of the June 28 hearing.

## H.

Debtor testified at the June 16 § 341(a) examination that she had filed no

---

[14]  All the trees subject to the Riley Creek contract, Debtor testified, were on the property at the time she and her husband acquired it or were naturally generated from existing trees, and she admitted never being engaged in the planting or growing of any trees for sale.

[15]  Debtor testified on June 28 that she gave a copy of the timber contract to her second bankruptcy attorney immediately after the § 341(a) examination and that she told him about the logging that same day, notwithstanding her denial of logging activity during her § 341(a) testimony.

[16]  Debtor testified on June 28 that she had mentioned the timber contract and her receipt of the "log check" to her first bankruptcy attorney in the chapter 7 but that he did not "put it down."  She, however, signed those initial schedules and statements as being true and correct to the best of her information and belief.  Like the initial schedules and SOFA, the amended versions filed on June 27 also fail to disclose the receipt of the $15,000.00 or the transaction of November, 2005.  These, too, were signed by Debtor.  And, despite the Debtor's knowledge, as reflected by what she says she told her first attorney, and despite the June 16 questioning on the subject, and despite the additional disclosures Debtor made on schedule B regarding $1,000.00 of felled logs and on schedule I regarding Debtor's anticipated "logging" income, the additional information and detail regarding Riley Creek came to light only at the June 28 hearing.

MEMORANDUM OF DECISION - 11

tax returns since 2000, and the reason was that she lacked income.  Ex. 8 at 71.  In

the 12 days between the § 341(a) meeting and the Motion hearing on June 28,

Debtor retained an accountant and had tax returns for the years 2000 through 2005

prepared[17] and then filed them with the IRS and the Idaho State Tax Commission

by physically delivering the returns to the tax authorities' Coeur d'Alene, Idaho

offices on June 27.

Debtor's response to SOFA question no. 1 – in which she asserted no

business was conducted since 1997 –  was, she now admits, false.  She also admits

false § 341(a) examination testimony regarding the logging of timber and rental of

pasture.

She further said nothing in her schedules or statements, or at the § 341(a)

examination about selling equipment.  She admits now that, in fact, $7,500.00 of

scrapped equipment was sold in 2005.  *See* Ex. 1A (2005 tax return).

## I.

Debtor's 2005 Form 1040 tax return, Ex. 1A, reflects "total income" of

$20,298.00 comprised of a capital gain of $15,000.00 and $5,298.00 in "farm

income."  *Id*. at lines 13,18, 22.  The $15,000.00 was from the sale of timber in

November, 2005, as discussed above.  Form 4797 of the tax return reflects this

timber was "acquired" in 1955 and sold November 10, 2005, for $15,000.00, with

---

[17]  They were prepared from "two boxes" of documents even though Debtor had testified
that she lacked books and records.  She attempted to distinguish these documents from "records."

MEMORANDUM OF DECISION - 12

no basis being shown and the entire amount characterized as gain.

Debtor's "Schedule F" to the 2005 return (profit or loss from farming)

discloses $1,200.00 in sales of livestock, $1,000.00 in "firewood" sales, $3,000.00

in pasture rent, and $7,500.00 in scrap metal sales, for a total of $12,700.00 gross

farm income.  After subtracting expenses of $7,402.00, Debtor had net farm

income of $5,298.00.

## DISCUSSION AND DISPOSITION

### A.
### Movants must establish "cause"

The motion of the UST in which FSA and Maynard join is premised on

§ 1112(b)(1) of the Code, which states:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1).[18]

---

[18]  The Court is aware that under BAPCPA, § 1112(b)(3) requires hearings on such motions to occur within 30 days and decisions to be rendered within 15 days after the commencement of the hearing.  The Motion was timely scheduled for hearing by the UST. However, the Court's Decision, today, is admittedly issued more than 15 days after the commencement of the hearing on June 28.  The Court, cognizant of its own trial schedule and its several judicial and administrative demands, and in light of the issues raised by the litigants

(continued...)

MEMORANDUM OF DECISION - 13

**B.**
### The listing of cause in § 1112(b)(4) is not conjunctive but, rather, disjunctive

The first issue under § 1112(b) is one Debtor has not specifically raised but which must, nonetheless, be addressed.

Section 1112(b)(4) states that "For purposes of this subsection, the term 'cause' *includes* – " and then sets out sixteen subparagraphs (A) through (P). This introductory language, indicating that cause "includes" the items listed, is essentially identical to the introductory language found in pre-BAPCPA § 1112(b) before a listing of cause in § 1112(b)(1) through (10). Under § 102(3), the terms "'includes' and 'including' are not limiting" or, in other words, are nonexclusive.

However, BAPCPA's revisions to what had been the listing of examples of cause in former § 1112(b) changed, in the penultimate subsection, the word "or" to the word "and." *Compare* § 1112(b)(9) (2004) with § 1112(b)(4)(O) (2005).

Two decisions have, to date, addressed this language change. *See In re 3 Ram Inc.*, 343 B.R. 113 (Bankr. E.D. Pa. 2006); *In re TCR of Denver, LLC*, 338 B.R. 494 (Bankr. D. Colo. 2006). The earlier decision, *TCR of Denver*, held that the term "and" in § 1112(b)(4)(O) – which would appear to require that *each* of the elements of § 1112(b)(4)(A) through (b)(4)(P) be present before cause could

---

[18](...continued)
herein, finds and concludes under § 1112(b)(3) that "compelling circumstances prevent the court from meeting the time limits established by this paragraph."

MEMORANDUM OF DECISION - 14

be found and dismissal or conversion ordered – would lead to an absurd result.

338 B.R. at 499.  In fact, it would make the statute a nullity because certain of the

(b)(4) elements are mutually exclusive.  *Id.*

      Further, reading the "and" in § 1112(b)(4)(O) as written would negate the

opening language of § 1112(b)(4) (*i.e.*, that "[f]or purposes of this subsection

[1112(b)], the term 'cause' includes") which under § 102(3) has a nonlimiting

effect.[19]  Reading the statute in this fashion renders the word "includes"

meaningless, and courts are cautioned against such a construction.  *See*, *e.g.*,

*United States v. Handy*, 761 F.2d 1279, 1280 (9th Cir. 1985) ("A statute should be

construed so as to avoid making any word superfluous."); *McAlister v. Slosberg*

*(In re Slosberg)*, 225 B.R. 9, 20 (Bankr. D. Me. 1998) (citations omitted).[20]

      *TCR of Denver* cogently and persuasively analyzes this BAPCPA

amendment.[21]  That Court concluded that it must read the "and" in

§ 1112(b)(4)(O) as an "or."  338 B.R. at 500 ("[W]here the word 'and' is used

---

[19]  The alternative construction imagined by the court in *TCR of Denver* (that the "and" requires all the elements in (b)(4)(A)-(P) to be shown, and that "includes" means only that there may be additional factors over and above the sixteen) is found equally implausible.  *See* 338 B.R. at 499.

[20]  As discussed, the Court rejects the idea that by using the word "and" in new § 1112(b)(4)(O), Congress intended to require a finding that *all* enumerated examples of cause existed.  The Court similarly rejects below, any argument that this word change reflects an intent that cause is limited to *only* those 16 listed examples.

[21]  The Court in *3 Ram, Inc.*, found the enumerated examples of cause in § 1112(b)(4) to be, like its pre-BAPCPA corollary, "illustrative, not exhaustive."  343 B.R. at 117 (noting, also, that § 102(3) was not amended and its operation not altered).  It cites *TCR of Denver*, but does not discuss the "and" versus "or" issue.  *Id.*

MEMORANDUM OF DECISION - 15

inadvertently and the intent or purpose of the statute seems clearly to require the word 'or,' this is an example of a drafting error which may properly be rectified by a judicial construction.") (quoting 1A Norman J. Singer, Statutes and Statutory Construction § 21:14 (6th ed. 2003)).[22]  *See also In re Kane*, 336 B.R. 477, 487 (Bankr. D. Nev. 2006) (addressing ability of courts to reform legislation to address "scrivener's error" where "the very face of the statute [makes] clear . . . that a mistake of expression (rather than of legislative wisdom) has been made.") (citations omitted).

This Court agrees.  The "and" must be read as an "or" and the listing of cause in § 1112(b)(4) is in the disjunctive.

## C.
### The listing of cause in § 1112(b)(4) is nonexclusive

As mentioned, § 1112(b)(4) uses the term "includes" consistent with former § 1112(b)(1)'s use of "including."  There has been no alteration of § 102(3) which requires such terms be given nonlimiting construction.  *See 3 Ram, Inc.*, 343 B.R. at 117.

Under existing § 1112(b) precedent, a movant is not required to prove any

---

[22]  The Supreme Court in *Lamie v. United States Tr.*, 540 U.S. 526 (2004), rejected arguments that an alleged grammatical or other drafting error in the Bankruptcy Code should be judicially cured.  In its ruling – in what now would appear a small flash of irony – the Court stated: "This [*Lamie*] is not a case where a 'not' is missing *or where an 'or' inadvertently substitutes for an 'and.'*"  *Id.* at 535 (emphasis supplied).  It appears that, in new § 1112(b)(4)(O), just such an inadvertent substitution occurred.

MEMORANDUM OF DECISION - 16

particular element in the statutory list so long as it proves "cause" exists.  In this

Circuit, the court has discretion to consider alleged causes not specifically listed in

§ 1112(b).  *See Wiersma v. O.H. Kruse Grain & Milling (In re Wiersma)*, 324

B.R. 92, 114 (9th Cir. BAP 2005) (holding the list of causes in § 1112(b) is non-

exclusive and the bankruptcy court has broad discretion in determining cause);

*Chu v. Syntron Biosearch, Inc. (In re Chu)*, 253 B.R. 92, 95 (S.D. Cal. 2000)

(same); *Pioneer Liquidating Corp. v. United States Tr. (In re Consol. Pioneer*

*Mortgage Entities)*, 248 B.R.368, 375 (9th Cir. BAP 2000) (holding that "[t]he

enumerated causes [in § 1112(b)] are not exhaustive, and 'the court will be able to

consider other factors as they arise, and to use its equitable powers to reach an

appropriate result in individual cases.'").[23]

The case law under former § 1112(b) remains applicable and relevant; there

is no indication that in making the BAPCPA amendments Congress intended to

overrule this well-accepted judicial interpretation.[24]

_____

[23]  This case law is consistent with legislative history: "Subsection (b) [of § 1112] gives
wide discretion to the court to make an appropriate disposition of the case when a party in interest
requests. . . . The list [of grounds in that subsection] is not exhaustive.  The court will be able to
consider other factors as they arise, and to use its equitable powers to reach an appropriate result
in individual cases."  H.R. Rep. No. 95-595 at 405-06 (1977).

[24]  "The normal rule of statutory construction is that if Congress intends for legislation to
change the interpretation of a judicially created concept, it makes that intent specific.  The
[Supreme] Court has followed this rule with particular care in construing the scope of bankruptcy
codifications."  *Midlantic Nat'l Bank v. New Jersey Dept. of Env'l Prot.*, 474 U.S. 494, 501
(1986) (citation omitted).

MEMORANDUM OF DECISION - 17

**D.**

**Movants are not prohibited from arguing cause
that would also support appointment of a trustee**

Part of the "cause" that the UST and creditors wish the Court to consider

under § 1112(b) is the criminal action, Debtor's guilty plea, and her impending

sentencing.  They argue that the nature of the admitted offense – conversion of

FSA's cattle collateral – and the looming sentencing of Debtor render her

"ineligible" to be a debtor in possession under chapter 11[25] or, if she is eligible,

that it constitutes good cause to convert the case.

Debtor seems to concede for purposes of argument that the criminal plea

and sentencing issues are sufficient grounds to prosecute a motion for appointment

of a trustee under § 1104.  That section states in relevant part:

> (a) At any time after the commencement of the case but before
> confirmation of a plan, on request of a party in interest or the United
> States trustee, and after notice and a hearing, the court shall order the
> appointment of a trustee–
>
>> (1) for cause, including fraud, dishonesty, incompetence, or
>> gross mismanagement of the affairs of the debtor by current
>> management, either before or after the commencement of the
>> case, or similar cause, but not including the number of holders
>> of securities of the debtor or the amount of assets or liabilities
>> of the debtor;
>> (2) if such appointment is in the interests of creditors, any

---

[25] The UST and joining creditors have not provided the Court with any authority
regarding the alleged "ineligibility" of Debtor to act as a debtor in possession.  Section 1101(1)
states that "'debtor in possession' means debtor" and contains no eligibility standards or
qualifications.  Certainly the status of debtor in possession can be lost if a trustee is appointed
under § 1104.  But the idea of *ipso facto* disqualification or lack of eligibility was not established.

MEMORANDUM OF DECISION - 18

> equity security holders, and other interests of the estate, without
> regard to the number of holders of securities of the debtor or the
> amount of assets or liabilities of the debtor; or
> (3) if grounds exist to convert or dismiss the case under section
> 1112, but the court determines that the appointment of a trustee
> or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104.

Debtor argues, however, that even should the existence of criminal conversion of the government's cattle collateral be found to reflect "fraud [and/or] dishonesty . . . before . . . the commencement of the case" within § 1104(a)(1), this supports only relief in the nature of appointment of a chapter 11 trustee, something that is not yet before the Court.  She acknowledges that Maynard has filed a motion for conversion that seeks, in the alternative, appointment of a chapter 11 trustee.  *See* Doc. No. 61.  But she notes that it has yet to be heard[26] and also points out that the UST did not seek § 1104 relief in its Motion.[27]  Even though Debtor will soon be required to face the issue in responding to Maynard's § 1104 request, she wishes to exclude it from the present § 1112(b) determination.

Debtor's argument is, in part, based on the fact that § 1104(a)(3), added by

---

[26]  Maynard's motion, Doc. No. 61, filed June 23, is scheduled for hearing on August 17. *See* Doc. No. 86.

[27]  Debtor's argument about the UST's failure to plead § 1104 elides § 105(a) which gives the Court the ability to raise and determine issues without a party's motion.  Section 105(a) provides "No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

MEMORANDUM OF DECISION - 19

BAPCPA, specifically references § 1112(b).  She contends that BAPCPA amendments to § 1112(b) did not similarly incorporate § 1104(a) so that cause to appoint a trustee can not be used to support conversion or dismissal.[28]  Debtor's reading is strained and unpersuasive.

First, because § 1112(b)(4) uses the term "includes" and given operation of § 102(3), the listing of cause is nonexclusive.  The Court is not limited in its evaluation of any facts, here including the criminal action, plea and sentencing, that might inform the determination of whether cause exists to convert or dismiss.  Just because those facts might support § 1104(a) relief does not mean they are irrelevant or excluded from § 1112(b) analysis.

Second, Debtor has not established that *expressio unius est exclusio alterius*[29] or some similar principle applies here to prohibit the Court from considering under § 1112(b) facts that would also support § 1104(a) relief.  She certainly has pointed to no legislative history or analysis of BAPCPA amendments that validate that view.

Third, § 1104(a)(3) can simply be read as a recognition that, if grounds

---

[28]  Debtor is not entirely correct.  While § 1104(a)(1) cause is not specifically incorporated into § 1112(b), there is a cross-reference.  Section 1112(b)(1) commences "Except as provided in paragraph (2) of this subsection, subsection (c) of this section, *and section 1104(a)(3)*, . . . the court shall convert a case . . . or dismiss a case . . . if the movant establishes cause."  *Id.* (emphasis supplied).

[29]  This is a canon of construction (typically statutory construction) to the effect that "the expression or inclusion of one thing implies the exclusion of another."  *See*, *e.g.*, Black's Law Dictionary 620 (8th ed. 2004).

MEMORANDUM OF DECISION - 20

exist to convert or dismiss, the Court is not prohibited from choosing a "lesser"

remedy of appointment of a trustee or examiner, if it concludes that such an

alternative "is in the best interests of creditors and the estate."  In fact, the "except

as provided in . . . section 1104(a)(3)" reference found in the opening language of

§ 1112(b)(1) reinforces this interpretation.

And, fourth, Debtor's suggestion would negate the broad construction of

"cause" under § 1112(b) and the discretion given the courts under the pre-

BAPCPA case law, including that of this Circuit, as discussed above at part C.

Unless the statutory changes appear clearly designed to alter existing law, there is

a presumption that the prior law remains applicable and valid.  *See* note 24

*supra*.[30]

**E.**
**The movants have established cause**

On March 30, 2006, Debtor signed a Plea Agreement under which she

pleaded guilty to a single violation of 18 U.S.C. § 658.  This crime has

components of fraud and dishonesty.  Section 658 of Title 18 states in part:

"Whoever, with intent to defraud, knowingly conceals, removes, disposes of, or

---

[30]  *TCR of Denver* stated: "It is clear that Congress amended section 1112(b) to make it broader, more strict as to debtors, and more encompassing."  *Id.* at 500 (also noting the legislative history included a title to these provisions of "Expanded Grounds for Conversion or Dismissal and Appointment of the Trustee.")  It makes little sense to think that Congress intended the simultaneous amendment in § 1104(a)(3) to be construed so as to limit the Court's ability to consider potentially relevant grounds for conversion or dismissal under a broadened or expanded § 1112(b).

MEMORANDUM OF DECISION - 21

converts to his own use or to that of another, any property mortgaged or pledged to, or held by [FSA]" shall be subject to fine or imprisonment.  In the Plea Agreement, Ex. 2, Debtor acknowledges the elements of the crime as including knowing disposition and conversion and acknowledges that she acted with the intent to defraud.  Such fraud and dishonesty falls within the express language of § 1104(a)(1) and, the Court above has found, it is not excluded from consideration under § 1112(b)(1) and (4).  There is cause to convert the case to chapter 7.

There is additional cause.  Debtor has made materially incomplete and, under the weight of the evidence, knowingly false sworn statements on her schedules and statements of financial affairs.  She indicated she had no gross business income since 1997.  Within two months, she had amended to disclose over $43,000.00 of such income in 2004, 2005 and first quarter of 2006.  She also omitted animals and equipment of significant value.

Debtor's testimony at the § 341(a) examination regarding salvage logging was materially incomplete and minimized what actually occurred.  In November, 2005, just five months prior to filing, Debtor had entered into a written contract for logging and received $15,000.00.  Not only was her June 16 testimony incomplete and by omission misleading, she made no disclosures regarding this contract or the income received on her initial or amended schedules or SOFA responses.

MEMORANDUM OF DECISION - 22

A similar false statement was made when Debtor stated that she had not leased any pasture since 2002.  It appears from the 2005 tax returns, generated from Debtor's own records within an extremely short period after testifying on June 16, that she had indeed leased pasture in 2005 and had received $3,000.00 therefrom.

Debtor denied having any books and records which could be reviewed, and claimed to have provided none to either of her bankruptcy counsel.  Yet she had such records, and used them between June 16 and June 27 to prepare and file several years of tax returns and amended schedules.  During June 28 questioning, she also admitted giving records to her first bankruptcy attorney and providing one quite relevant record, the timber contract, to her second attorney immediately after the June 16 § 341(a) examination.  But no disclosure was made regarding the contract or the income in the June 27 amended schedules and SOFA which Debtor then signed as true and correct.

Debtor admitted on June 28 several of the false statements she made on June 16 and several of the omissions on her sworn bankruptcy filings.  In attempting to explain or justify her conduct, Debtor testified at the June 28 hearing, in response to leading questions from her counsel, that she was not feeling well on the day of her § 341(a) examination.[31]  Debtor also testified to the

---

[31] On June 16, Debtor initially said she was feeling well.  Ex. 8 at 17.  On questioning by
(continued...)

effect that she really was attempting to be accurate in her schedules and testimony,

that the errors were simply mistakes, that she could not explain why they

happened, and that she was trying to do a better job. Under all the circumstances

and the weight of the evidence, the excuses are not credible.

The conduct described establishes bad faith in the initiation and prosecution

of the chapter 11 case. There is cause to convert or dismiss.

### F.
### Debtor's case can be converted

When cause is established, the Court must decide a second question:

whether conversion or dismissal is "in the best interests of creditors and the

estate." *See* § 1112(b)(1). Debtor argues, however, that conversion of the case to

chapter 7 is prohibited by § 1112(c) which states: "The court may not convert a

case under this chapter to a case under chapter 7 of this title if the debtor is a

farmer . . . unless the debtor requests such conversion."

To determine whether Debtor is a farmer protected from involuntary

conversion, reference is first made to the definitional sections of the Code.

"Farmer" is defined by § 101(20), and requires that the debtor "received

more than 80 % of such person's gross income during the taxable year of such

person immediately preceding the taxable year of such person during which the

--------

[31](...continued)
her counsel at the end of the examination, she said she was not. *Id.* at 161.

MEMORANDUM OF DECISION - 24

case under this title concerning such person was commenced from a farming

operation owned or operated by such person."  In turn, the "farming operation"

from which the income must derive is defined in § 101(21).  It "includes farming,

tillage of the soil, dairy farming, ranching, production or raising of crops, poultry,

or livestock, and production of poultry or livestock products in an unmanufactured

state."[32]  Case law indicates that the burden should be placed on the Debtor to

prove her eligibility or qualification as a farmer for § 1112(c) purposes.  *See*, *e.g.*,

*In re Fonke*, 310 B.R. 809, 814 (Bankr. S.D. Tex. 2004) (addressing a similar

prohibition, now found at § 1307(f), on involuntary conversion to chapter 7);

*accord In re Koppes*, No. 99-01748-D, 2000 WL 150836 at *3 (Bankr. N.D. Iowa

Jan. 5, 2000) (addressing burden on debtors to establish eligibility as "family

farmers" under chapter 12); *In re Bircher*, 241 B.R. 11, 14 (Bankr. S.D. Iowa

1999) (same).

The "taxable year" for Debtor is a calendar year, as established by the

various returns she prepared and filed.  She filed the case in 2006, thus 2005 is the

relevant year under § 101(20).

To find the total "gross income" for 2005, several portions of the 2005 tax

---

[32]  Because this section uses the term "includes," this Court has held that the listing is
non-exclusive.  *In re Nelson*, 291 B.R. 861, 867 n. 5 (Bankr. D. Idaho 2003).  Other decisions
interpreting and applying § 101(21) are addressed below.

MEMORANDUM OF DECISION - 25

return, Ex. 1A, must be reviewed.[33]  Page 1 of Form 1040 and Form 4797 show a

$15,000.00 capital gain (the timber sale).  Schedule F of Form 1040 (profit or loss

from farming) and its supporting "Statement 1" show gross income in the

following amounts: $1,200.00 (sales of livestock or other products raised),

$1,000.00 (firewood), $3,000.00 (pasture rent), $7,500.00 (scrap metal).  In

addition, Debtor received Social Security benefits in that year totaling $6,804.00.

*Id.* at Idaho Form 40 supplemental schedule (Form 39R), line C3.[34]  It appears,

therefore, that Debtor had $34,504.00 in gross income from all sources in 2005.[35]

     The question is whether 80% of this $34,504.00 (*i.e.*, $27,603.20) was

income from a "farming operation" of Debtor.  Conversely, if there is more than

20% ($6,900.80) in non-farm income, Debtor is not a farmer and may be

involuntarily converted.[36]

---

[33]  There was no positive evidence of Debtor's income other than the $15,000.00 Riley
Creek check and Debtor's Rule 801(d) admissions in schedules.  The use of the 2005 tax returns
Debtor caused to be prepared and subsequently filed also appear within Fed. R. Evid. 801(d)(2).

[34]  The response to question 2 on the amended SOFA shows $6,720.00 in Social Security
benefits the year prior to filing.  The Court uses the tax return figure instead.

[35]  *Fonke* notes that gross income is not defined for Bankruptcy Code purposes, and
concluded that the definition in 26 U.S.C. 61(a)(3) could be used.  310 B.R. at 814.  That section
provides "gross income means all income from whatever source derived, including . . . [g]ains
derived from dealings in property."  By parsing Debtor's 2005 return to find all sources of
"gross" income, it becomes evident that the Court's total of $34,504.00 is different from the "total
income" of $20,298.00 shown on Debtor's Form 1040.  However, this latter figure uses "net"
farm income from Schedule F and the Court's focus must be on "gross" income under § 101(20).

[36]  Maynard argues that there is inadequate proof that the gross income figures on the tax
return are reliable and should be used.  In fact, Maynard posits that Debtor, realizing that Social
Security benefits would likely be cast as non-farm income, falsified other income figures to
(continued...)

MEMORANDUM OF DECISION - 26

Debtor's $6,804.00 in Social Security benefits received in 2005 are non-farming income under this Court's decision in *In re Stoddard*, 92 I.B.C.R. 222, 223 (Bankr. D. Idaho 1992). Thus, if $96.80 or more of the other gross income is also non-farm in nature, Debtor fails to sustain her burden.[37]

The parties' focus is on the $15,000.00 income received from Riley Creek, shown for tax purposes as capital gain, flowing from the salvage of timber on Debtor's real property. The cases support consideration of *all* income, even if that income is subject to treatment and analysis for tax purposes as capital gains. *See Fonke*, 310 B.R. at 814; *Bircher*, 241 B.R. at 14-16; *Koppes*, 2000 WL 150836 at *6. Thus, the fact the timber sale proceeds were reported as capital gain does not exclude them from gross income under § 101(20).

The pivotal issue is whether this particular gross income "was sufficiently related to the Debtors' farming activities to permit characterizing that net capital

---

[36](...continued)
ensure that those benefits of $6,804.00 would not exceed 20% of the total. Maynard's argument need not be reached since the Court concludes that other categories of Debtor's declared gross income are also non-farm in nature.

[37] It may seem odd that important determinations can swing on a $96.80 variance, but it is not unusual. In *Fonke*, the debtor argued that capital gain from the sale of a non-farm asset (a service station) was not "gross income" at all and should be entirely excluded from the 80% analysis. The court found though that the capital gain should be included and, with it, that debtor had less than 50% of farm income. 310 B.R. at 815. However, it further found that even if debtor's argument was adopted, a careful analysis showed that he had 79.41% of farm income and was still not a farmer. *Id.* The court admitted that 0.59% (or there $305.00) was a small amount of money, but held that Congress established a "bright line rule" that courts were not empowered to vary. *Id.*

MEMORANDUM OF DECISION - 27

gain as farm income rather than as non-farm income." *Bircher*, 241 B.R. at 15.[38]
The key was articulated in *Bircher* as "the extent to which the income in question
bears the relation to [debtor's] farming activities prescribed by the words of the
statute." *Id.* (quoting *In re Easton*, 883 F.2d 630, 633 (8th Cir. 1989)). *See also*
*Koppes*, 2000 WL 150836 at *5-6.

In closely reading those cases, and those they cite and discuss, it becomes
clear that income from sales of assets may be related to a debtor's "farming
operations" within the contemplation of § 101(21) if the debtor sells in furtherance
of the farming activity. Thus, culling livestock, selling machinery with the intent
of replacing it, and similar activities can be included in farming operations and the
income therefrom is farm rather than non-farm in nature. In fact, even
"liquidations" of real estate or chattels may so relate, if undertaken in a conscious
effort to "downsize" a farming operation. That is what occurred in *Bircher*, and
the court there emphasized that the debtors' sale of a 50-acre farm was to enable
them to keep farming, and not a step toward terminating their farming operation.
241 B.R. at 16.

This analytical approach cuts against the characterization of most of
Debtor's gross income as related to farming operations under § 101(20) and (21).

---

[38] The court in *Bircher* was aware that the actual sales price, not the net capital gain,
would be a proper reference given the statute's focus on "gross income" but recognized it made
no difference in that case because the net gain was alone sufficient to control the outcome. 241
B.R. at 13 n.8.

MEMORANDUM OF DECISION - 28

For example, sale of "firewood" appears totally coincidental to any farming or ranching operation.  And the sale of old (farm) equipment for scrap metal value was not shown to be part of an ongoing process of replacement of equipment for use in farming or ranching.  In fact, there was no indication that Debtor intended to continue farming activities.  As noted, she proposed to abandon or sell the remaining 60 head of cattle, and to sell her real property within 6 months.[39]

Focusing on the timber sale itself helps clarify, and resolve, these issues.

Even if a debtor has some farming activities, not everything that debtor does necessarily relates to that farming.[40]  Here, Debtor's farming activities and operations related to raising livestock.  There was no showing that any activity of Debtor related to timber on the Priest Lake property was within the definition of farming in § 101(21).

In *In re Wilks*, 87 I.B.C.R. 287 (Bankr. D. Idaho 1987), this Court considered debtors' contention that they were "tree farmers" rather than contract

---

[39]  The Court appreciates that the inquiry under §§ 101(20) and (21) is not identical to that for chapter 12 eligibility.  However, the prohibitions on involuntary conversion of farmers into liquidation, as found in § 1112(c), § 1208(e) and § 1307(f), have roots in the same soil. Congress intended that farmers, particularly family farmers, be protected from liquidation and benefitted in their attempts to reorganize.  As noted in *Koppes*, courts liberally construe the definition of farming "in order to further Congress' purpose of helping family farmers to continue farming."  2000 WL 150836 at *4 (quoting *In re Watford*, 898 F.2d 1525, 1527 (11th Cir. 1990)).

[40]  For example, in *Bircher*, the debtors were employed essentially "full time" off the farm (in construction and as a licensed practical nurse), but also had farming activities.  The court agreed with debtors that their sale of a 50-acre farm, their least desirable acreage, was "interwoven" with and necessary to perpetuate their farming operations.  241 B.R. at 16.

MEMORANDUM OF DECISION - 29

loggers.  The Court concluded that debtors' contract logging was not part of a farming operation under § 101(21).

The Wilks' business consisted generally of harvesting trees from property of others, but they also harvested trees from 120 acres of their own property.  They had thinned trees on this property, but planted no new trees.  *Id.* at 287-88.  The Court concluded the harvesting of timber on the debtors' own property was also not farming:

> Those trees the debtor removed from their own property and have not been replanted.  The debtors' operation does not include planting, tilling, or raising the trees, nor are the trees subject to the traditional cyclical risks inherent to farming.

*Id.* at 289.  The court in *In re Sugar Pine Ranch*, 100 B.R. 28 (Bankr. D. Or. 1989) considered a similar situation.  But there, debtors harvested merchantable timber from their property by selective cutting on a sustained yield basis, with the objective of maintaining a perpetual crop.  The court found this activity was part of an integrated farming operation.

In evaluating these cases, and the factors they discuss, the Court concludes that Debtor's salvage logging is not a farming operation under § 101(21) and the proceeds therefrom are not farm income within § 101(20).  The trees were never planted or raised as a crop or on a sustained yield basis, nor were they part of the farming and ranching operations conducted over several decades.

The income from the sale of timber and firewood, $15,000.00 and

MEMORANDUM OF DECISION - 30

$1,000.00 respectively, or a total of $16,000.00, is not farming income. This, in addition to the Social Security income, defeats Debtor's ability to meet the 80% farm income requirements and qualify as a farmer under § 101(20).[41] Involuntary conversion is not prohibited under § 1112(c).

### G.
### Debtor's case should be converted

In evaluating what is in the best interests of the estate and its creditors, the Court concludes that the case should be converted rather than dismissed. Even Debtor contemplates that the real estate should be liquidated to generate funds necessary for payment of creditors (including, it appears, the anticipated restitution to FSA required under the criminal plea and sentencing process). The Court can see no compelling reason to dismiss the case, and no party has suggested one.

### CONCLUSION

Upon the foregoing and the entire record here, the Court finds that the Motion is well taken and supported by the evidence, that cause exists under § 1112(b), and that conversion of the case to chapter 7 is compelled by that evidence as being in the best interests of creditors and the estate. The Motion will be granted, and an appropriate order will be entered.

---

[41] The Court therefore need not consider further whether the scrapping of old machinery would qualify as farm income, nor address the pasture rent.

MEMORANDUM OF DECISION - 31

DATED:  July 28, 2006



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE